Our final case for argument is 25-1792 Ligado Networks v. United States. Mr. Yale, please proceed. May it please the Court. Ligado's complaint in this case suffers from several fatal flaws, and the trial court erred in partially denying the government's motion to dismiss. First, I'd like to address the Court's decision on jurisdiction. This is a regulatory dispute that belongs at the FCC because Congress channeled these types of disputes through the Comprehensive Remedial Scheme of the Communications Act. This Court, in four separate occasions, has held that the Communications Act is a Comprehensive Remedial Scheme, and in Alpine and Sandwich Isles, it held that because such a scheme is comprehensive and remedial, that it displaces Tucker Act jurisdiction, including for taking claims. It wasn't quite as general as that, was it, either of the two decisions you're referring to, Alpine or Sandwich? Well, it pointed out that in each case, the relief that was being sought under the Tucker Act was effectively available from the Commission. And I think the sticking point in your jurisdiction argument, the challenge is those decisions don't say that when you have a case in which that seems not to be true, there would nevertheless be a BORMES ouster of Tucker Act jurisdiction. Well, we would agree, Your Honor, that there needs to be adequate relief that can be provided through the Communications Act by the FCC. We think that there is adequate relief here. But if they're right on the merits of everything, which is a big, big if, then you're not suggesting, or are you, that the FCC could give them years' worth of damages for what, by assumption, would be a taking? Well, I think that the FCC could hear the taking claim. There's no procedural bar to that. No, but we're talking about retroactive relief as opposed to prospective use. How can the FCC give them retroactive relief if they say we're entitled to $10 billion from DOD's use of the L-band? Where in the FCC's statute does it have the authority to award damages for past improper use? Well, we would agree that the FCC doesn't have the authority to cut a check for that amount of money, but it has... Any amount of money. I want you to answer that as a question. Does the FCC have the ability to give them any damages for DOD's past use if that is determined to be a taking? Money, no. With the exception of if in a certain case, I'm not saying that this is the case that they're, you know, that can refund options, but what it can do is it could reallocate spectrum. And we... But that's only prospective relief. Well, if you're being provided spectrum equal to what the taking was, to me that... Wait, you're saying we're not going to give you the money, but we'll give you a set of new tires and steak knives, and it all balances out. Well, respectfully... Extremely valuable steak. Well, respectfully, the spectrum is valuable. I don't think either side disputes that. And so I think when you have a scheme where Congress is saying the FCC is the expert to deal with spectrum interference, to deal with spectrum allocation... I'm going to transition now from the jurisdictional question to the property interest question, which does perhaps have something to do with this. Is this kind of more an FCC issue than a takings court issue? Some kind of, I don't know, I mean these to be kind of objective, just tell me what the laws say are. Where is the source of the asserted exclusivity asserted by Legato? I didn't see it in the April 2020 order. Is it something in Title 47? I'm trying to get a baseline here, all as part of trying to think about whether maybe there isn't enough exclusivity. Any exclusivity that there is runs through the FCC, even that is 303Y would allow a second provider or user of the band. Revocation is possible. Transfer is conditional on FCC authority. Maybe, and a related question, if, say, a city, a locality did what they accused DOD of doing, how would they get relief from that? Can they go to court? Is there an action in ejectment? Is there an equivalent to what in the patent world is 35 U.S.C. 281? There are so many questions. You've got to let him answer at least one of them. I mean, I want your answers to all of them. The nature of the right that's being claimed depends on all of this. Sure. The purported nature of the right depends on, it has to only depend on the Communications Act, because there's obviously no state law or common law rights here. And here, what Congress has done is set up a system where the FCC can issue the license, but it's limited in nature. There can be modification. There can be revocation. Does the license or the statute say this is exclusively for legato? The license grants the ability to use the spectrum for a particular purpose. But, again, when you look at the case law, for example, even in a teenage court of... This is exactly what your brief did, and it was really frustrating because we're not experts in communications law. Or in the facts that give rise to these cases. Throughout his brief, Mr. Verrilli extensively touted the right to exclude as an important stick in the bundle of property rights. And, therefore, the government didn't really ever dispute it. They said, oh, the FCC could revoke. Fair enough. FCC could modify. But what it never said is FCC did not give you the right to exclude. They gave you the right to use. They gave you a bare license. And that's... You never said that anywhere in your brief. And we're trying to figure it out because I'll tell you, not only did I read 2020, I read the 1989 thing. And the word exclusive is nowhere. Now, there is a paragraph in the 1989 thing that makes it seem like the FCC is saying they might not be giving any other L-band licenses while legato has this license. But you didn't dispute the exclusivity. And I'm trying to... We're trying to figure out from when the exclusivity came because it's not in the license. So is it in the technology? I don't think so. I mean, I think other people could technically jump on the L-band and use it, but that would probably cause interference to be bad. But we're trying to figure out because exclusivity, the right to use is a stick in the bundle. The right to exclude others and use exclusively is a much bigger stick in the bundle. So can you just focus on that and tell me what the heck is going on with that? They've been given the right to use, subject to all of the conditions, this particular band of the L-band. There was not a guarantee by the FCC that there would... It's an interest to use. There's no guarantee by the FCC in the order or in the statute that there could be no future licensees. Now, there are some practical issues, obviously, in terms of interference or what. Can I ask you to write now for practical purposes? They are the only ones that have been given the right to use this. License to use for this particular purpose at this point. But again... I just want to make sure I understood that. Correct. But again, the FCC has the ability... To issue a companion license to someone else and then Legato would have to share the L-band with them? If that was technically feasible, that's correct. Would the FCC, on their conditions and when they'll grant, would they make sure there was no interference? Well, yes, Your Honor. I mean, what the FCC has been... I mean, these proceedings have been ongoing for a while. And what the FCC, throughout this spectrum allocations, is trying to do is have bands where there's not interference amongst the various users. And so... So does that mean that technically they do have an exclusive license? I don't mean de facto exclusive because the FCC has just not chosen to distribute any portion of the L-band to somebody else. I mean, you keep saying, if it were technically feasible. And this is what we don't really understand and we need help understanding. Because, like, for example, if I say I can give you this glass of water, I may not say it's exclusively yours, but nobody else can have the glass. There's just this one glass of water. And we drink the water, it's gone. You know what I mean? Like, that's... So is it the case that the L-band can't... FCC really could not give a license to anyone else because of the nature of the license they gave to Legato and its intended use? Because if FCC were to do that, it would cause exactly the interference that FCC is trying to police against. Is that true, then? Well, I don't think that that's in the record, per se. Okay. I think the... Essentially, what we've pointed out is that at this point, there's only one... They are the exclusive license holder for this type of use in the L-band. So it would be simpler and, I think, less confusing to say they are, at present, the only licensed user. Full stop. For that... For this particular use. For terrestrial MSS, whatever. That is correct, Your Honor. So at this point, there's nobody else. And so, in that sense, there is a... Well, could there be? Because what matters to me... There's a difference between a bare license and an exclusive license, right? In assessing property interests. Isn't there? Correct, Your Honor. You're saying that under the record, you're not sure and you can't answer, could there be? Because you just said there's nothing in the record to let you know whether someone else would be able to use that same part of the spectrum without interference. Well, at this point, there hasn't been any other applications for that. But what we've sort of... What we have focused on is there's an ability to modify the license. Well, could they, as a technical matter, license someone else for the same L-band for the same purpose? I think the FCC would have to look at that. Here, they've gone through this entire process to get legato as the sole licensee in this particular band. So that's what the process... Okay. So one of the many questions I asked in the little... Whatever I did before. If they have a license, nobody else has a license, some intruder starts using the band. They don't like that. What can they do? Well, I think it depends who it is. I mean, if it's a... Assume it's me or the city of New York. They could go to the FCC. How? Under what? I want statutory or regulatory sites. 401B. 401B allows somebody who's aggrieved to go to the FCC and say, you gave me something, somebody else is interfering. And you can sue and disreport. After the FCC acts or directly or what? Well, I think it's a combination. You could bring it to the FCC and the FCC can go. It could be referred to DOJ and DOJ can essentially go after the individual as a criminal matter. So would Legato have a private right of action to sue the intruder in district court without getting an FCC commentary on that to alleging Section 301 says nobody can use this without a license and join them? Yes, they could go to district court. But the federal government is not a person under that particular statute. We are trying so hard here to disaggregate things that are all jumbled up. That's why I said me or a city. Forget the DOJ. That is correct. Just trying to understand. So they would actually have a private cause of action to go and exclude. That's correct, Your Honor. That's not helpful to you. Well, again, I think that there is an element of exclusivity here, but we think that the phishing license cases and a bunch of other cases have looked at the totality of... Don't worry about the time. You're going to have a lot more time. You said 401? 401. 401 what? I believe it's B, Your Honor. Excuse me. It's 401A. Any procedure to enjoin, set aside, or null any order of the commission. Excuse me. I'm reading the wrong section. I apologize. So the district courts of the United States shall not have jurisdiction upon application of the attorney general. That's not what we're talking about. We're talking about asking about a private right of action. B is if any person fails or neglects to obey any order of the commission. The commission or any... That's not the situation I was asking about. The intruder is not subject to any order of the commission. Well, it would be subject to under 301... Does it say that a license holder or anybody else can sue in district court to enforce Section 301's requirements that Spectrum not be used without a license? I don't think it says that specifically. So I don't think it says that specifically, but I think... So as you stand here, you really can't accurately answer any of the questions we have about enforcement options available to a private party licensee under the FCC, which, by the way, is really problematic because that whole right to exclude is the most important stick in his bundle, and it's throughout his entire brief. Well, I could say that, in general, what 301 through 303 says is that you cannot operate if you don't have a license. And so if you don't have a license, you're in violation of that particular... Let me just tell you why I keep thinking about the private right of action. You have this language from Sanders Brothers and from mobile radio or something, and there's a question about how broadly that language, which is stated in somewhat broad terms, should be read. One way of understanding the language is the kind of point you were making sort of thematically and with respect to the jurisdictional argument, that what we have here is really an FCC problem, so that maybe if there's no private right of action, and FCC can revoke, and FCC can add a second licensee, and any transfer is subject to the FCC, and all of this may depend on interference, which really the FCC is going to be a lot better at figuring out than a taking score. Maybe that language from Sanders Brothers should be given the effect of, without any qualifications, having to do with whether it's a right only against the FCC or just it's not a property right. So some of these details, this is the picture that's in my mind, a kind of argument for why maybe there isn't actually a takings law protected property interest built up from the deep role of the FCC in any kind of exclusivity they may have. No doubt, Mr. Varela, you're listening closely, because the government's not making this argument, but you're going to be asked about it when you get up here. Go ahead, Mr. Yale, answer the question if there is one. We do think that Sanders Brothers overall stands for the fact that when you look at the Communications Act, it doesn't provide any sort of private property right, any sort of private right of action against the government. So the Congress could have set forth a private right of action against the government to enforce it. They haven't done that. We think that that case law for over 100 years, almost 100 years, that's been the case, that no court has held that there's a cognizable property interest. And we think it's based on the fact that Congress could have supplied that. They could have supplied a way to sue the government. It could have provided these private property rights. But what it essentially provided is what's akin to a revocable privilege. Can you please explain to me how the NTIA intersects with the FCC to determine use? And in particular, I'd like to know whether DOD's use of the L band, as alleged in the complaint, was actually authorized by the NTIA. So government stations under the Communications Act, under this specific section, which says that 301, the licensing, doesn't apply to government stations. So the President has the ability to assign that. NTIA is the agency that assigns the government radio stations. NTIA has a bunch of other responsibilities. They coordinate with the FCC about allocations of spectrum. They provide... Does the FCC allocate to the government a certain spectrum? And then NTIA allocates within that the use of that spectrum within the various agencies of the government? Or does the FCC just say, we're not going to allocate, we're not going to give to any outsider, 1625 to whatever. And so the government just has it because it has it if it's not allocated? Well, Congress has sort of set up the dual system for government versus private. So the FCC allocates all of the bands that have been set aside for private use. There's another big bunch of spectrum that's exclusively for government use. I'm sorry, is that in the statute by frequency numbers or what? I think it's Congress has set forth what particular bands. And then, you know, there's obviously... Recently, there's been statutes about Congress saying that certain bands, that both NTIA and the FCC have to... So would the NTIA have the ability to authorize DOD's use of the L band? I mean, the FCC certainly has... I didn't ask anything about the FCC. The FCC is not relevant for government entities and DOD is a government entity. Only the NTIA, is my understanding. The NTIA doesn't have the ability to... Well, let me take a step back. There are sort of minor assignments of spectrum that the NTIA can issue that wouldn't interfere with sort of private licensees. You know, sort of emergency type situations. But with respect to the assignment, the L band we're talking about here, you know, the FCC is the one who is determining who has... And the NTIA does not have the authority to determine anything with respect to the L band. Correct. They have the ability to set forth their views with respect to the FCC and that's what happened in this particular case. But it's not... That band hasn't been set aside for government stations as other bands have. If... If... Legato was given an exclusive right to use the L band and if DOD is now using the L band, why isn't that compensable somehow to Legato? Well, again, our argument is that that falls into part two of the two-part takings theory, right? So there has to be a property interest established. So if there's a property interest established, then it gets to the situation, well, if a government agency is operating within that spectrum or preventing the use of the license, in that situation, there could be a taking. But our argument here, primarily, is that there's no cognizable property interest for the reasons we set forth, including the fact that, you know, it's a highly regulated industry, we have a situation where all of the potential property interests that Legato is pointing to is coming from Congress, coming through what the FCC has provided. Those can be taken away, they can be revoked, they can be modified. And that's a function of the Communications Act because as technology changes... And it's true with patents. Well, a couple of points on patents. One, there's a long history of the Supreme Court at least weighing in on whether patents are property interests. The patent statute specifically refers to patents as personal property or having the attributes of personal property. And we're also not saying that there... Our argument has never... Is it also generally the case that when the PTO takes away a patent, it's on the ground that it never should have been issued in the first place? Correct. That's generally the fact for cancellation. And it should have never... It was never a valid patent in the first place. A couple of points I do want to emphasize. We're not saying that Congress can never set... Can never provide a cognizable property interest for Fifth Amendment purposes. We're just saying when you look at this long line of case law, every single case has reached the same conclusion. I'm sorry, long line? Sure, from... I mean, I get standards. I get mobile radio. There's some other one maybe also more recent. Well, we cited the Third Circuit case that... Was there another D.C. Circuit case following?  Mobile Relay following it. You had a second site in your gray brief. Yeah, Mobile Relay is the case in the D.C. Circuit. We cited the Prometheus case from the Third Circuit. But the problem for me with those cases is they're as to the FCC. And I think it's possible based on how you've actually just articulated the way the property rights are distributed that they could have no property interest as against the FCC. The FCC could revoke or modify or whatever. But I'm beginning to think they've got a property interest against DOD. And I didn't come into this argument thinking that. Respectfully, when you look at the... But this is the benefit of your argument. Respectfully, when you look at the first step of the property interest argument, what we're arguing is you have to first look into the fact whether there's property at all. So, for example, when you look at the grazing cases, the fishing license cases, there can be no doubt there, right, that there's no property interest, right? But that goes towards the entire federal government. So, for example, if the Navy went and invaded the fishing grounds or whatnot and the fishing license holder, whoever held that license, said, well, there's a taking here, the response would be, no, there's no cognizable property interest. For the same reason, when you go through the analysis, you reach the same point. So this issue about there being sort of different actors involved... You don't read international paper as running counter to that. I know it's a fabulous opinion to read, as Holmes' opinions are, and sometimes a little hard to interpret, but that involved a grant of water by a government authority separate from the one that then commandeered the water to get all the power it could out of Niagara Falls. So when you look at that case, it seems like there's just a vast over-reading of what's in there. The water rights there were from state law, and there was really no focus on... This court has gone through, and when you look at the... There's no federal grant of water rights there. There was a federal license, but the initial grant of the water rights was under state law. I thought you ultimately read it to rest on a sentence that said, what the Secretary of War or Navy or somebody, War probably, said, I mean to guarantee payment for all the power that I can get. Correct. That turned out to require taking some of the water that had been diverted to international paper. And they were essentially viewing it as essentially something along the lines of a contract matter. But there wasn't the sort of going through that particular license and looking at all the various attributes of property. And so we just don't think that there can be much read into that. I mean, no court after that case has cited international paper for that proposition. And we think for good reason. And this court had set forth... With any money... I've got a bunch of factual questions. With any money paid for the legato license, like was there a spectrum auction? There was no auction here, Your Honor. What this... Was any money paid for the legato license? Not that we're aware of. Obviously, there might be some sort of nominal fees or something like that, sort of filing fees and things like that. But when you're talking about sort of pre-market paying for auction like in Alpine and like in other cases, no, that didn't... What led to this was the 2003 change in the regulations. So legato was operating in the MS. The satellite, you know, had that particular license. And because they changed the regulations, they were able to apply to get this ATC, this terrestrial use, which, you know, the government has obviously argued interferes with GPS. So there was no money paid in that sense. How do we know that there was money paid for the GPS but not for this additional use? No, Your Honor. There was not... I don't believe there was an auction for the MSS in the first place either, but certainly not for this. This was just strictly a regulatory change, and there's no property interest in sort of a regulation or a regulatory change. How do renewals work? There's an allegation in Mr. Borelli's brief that renewals are pretty much guaranteed, pretty close to automatic. Is that correct? I don't think that you could square that with Section 304 where applicants have to waive that sort of ability. They have to waive any claim to a particular spectrum. And so there are regulations that have set forth that, you know, there's sorts of requirements that sort of weigh in on renewal. But overall, the statute, which takes precedent, has said that there can be no claim, and that's what you would have to... Even if there is a recognized, I don't know, I'm not going to get the word right, but expectancy. The D.C. Circuit opinion that was cited in the Huber Treatise, Victor maybe, I think quotes... So what that is... Please, I know I talk a lot, but you've got to let me finish.  That there's a long-standing recognition of a balance between a expectancy interest that the commission has to draw and the ability to say, enough already, we have to go a different direction. Is that just where the law stands? Well, I think what that was referring to is sort of subjective renewal and... I'm sort of subjective. Well, sort of... Subjective expectations. Subjective expectations of renewal. I thought the D.C. Circuit recognized that this was a real-world policy for self-evident reasons that the commission had to take due account of. And I take it you're saying, sure, but that doesn't turn it into a property right. Well, I think when you're looking at the property right, the 304 would have to trump any sort of... what I would deem subjective expectation of renewal because of the fact that if you have to sign a waiver saying that you don't have a claim subject to the regulatory power of the United States, which is what 304 says, which is what applications have to sign, I think that takes precedent. Now, as a practical matter, license... I mean, again, we're not disputing licenses are very valuable. They are often just renewed. But that's... What we're pointing out is sort of the ability to modify the license to not renew and to revoke. I'd like to revisit FCC enforcement action. If Legado came to the FCC, if they identified an unauthorized user on the LBAN, if they came to the FCC, is the FCC required to take action against the unauthorized user? Well, they would be raising a takings claim. I think what the court held in Alpine is you have to... I'm sorry, why would they be raising a takings claim? My claim, I thought the example was somebody else is using the spectrum. They're violating 301. They're not allowed to use it without a license. They don't have one. What does the FCC do when it receives that? Well, I think the FCC would investigate and determine what would need to be done there. Investigate, is DOD actually doing this? They're in the best position to actually see what DOD is or is not doing. At that point, I mean, they could go to DOD. I don't think there's... Are they required to do this? Is the FCC required to pursue, to perform, to initiate an investigation if a licensee in legato circumstance brings to the FCC's attention unauthorized use? I think they would. I don't know of a statute that would say that they were necessarily required when that individual is another federal agency. But setting that aside, another federal agency, what if it's anybody, somebody else, another party, a nongovernmental entity? Yes. I mean, they are under an obligation to look into that. The FCC is under an obligation to look into it. When it's brought to the attention, and that can be referred through 401 to the federal government, the individual can... The FCC would, at that point, there'd be a petition. The FCC can issue an order there. Could the FCC say, oh, you're right about that, but actually we think this is a pretty good idea for this intruder to be allowed to do it, so we will now initiate license modification proceedings or a new 303Y proceeding to authorize the intruder? They could do that. They could always do that. They could always modify. I mean, on their own, the FCC can modify the license. Under 401? Excuse me. Under the statutory authority you provided that you said, I'm so sorry, but I'm sorry for interrupting Judge Charles's question, but you said the FCC would have a duty to look into it under 401. I thought that's what you said. What is the statutory basis for the duty to look into the alleged use of a licensing spectrum by another? Well, I think it goes down to the fact that unauthorized users of spectrum are... When an entity has a license, other users are not supposed to operate within that spectrum. Where do I see in 401? I think you cited 401, didn't you? I did cite 401. What language in 401 are you relying on? 401 I'm relying on just for the end result of what could be done. It's 401C? Correct. Well, that doesn't say anything. It just says upon request of the Commission, it shall be the duty of the United States Attorney for all law. It doesn't say what the Commission has to do. Well, this would be initially, initially there's administrative... So is there some other statutory authority that you're relying on? I can't point to another statutory authority, but there's... Mr. Yale, how about if we restore the two minutes you requested of rebuttal time? Sure. And go ahead and hear from Mr. Varelli at this point. Thank you. Obviously, before you start, if you have longer than 15 minutes, just don't worry about the time. I appreciate that, Your Honor. Thank you. Don Varelli for Legato. I'm happy to answer any questions about jurisdiction if the Court has any, but perhaps it makes more sense to go straight to the focus so far about the nature of the property right and perhaps starting with exclusivity would be the best place. As Your Honor's questions reflect, the exclusivity flows in a very meaningful sense from the prohibition in Section 301 of any unlicensed person to use the spectrum. Now, in terms of the enforceability of that provision, Judge Toronto, you asked about that. Section 402B of 47 U.S.C., as I understand it, I'm doing this from memory, but I believe it's correct, provides that any injured person, in addition to the Attorney General, may bring suit to obtain adjunctive relief for a violation of... 402B says appeals may be taken from decisions and orders of the Commission. I may have the wrong... To the D.C. Circuit. Then I have the wrong provision. I'm sorry, but I believe there is a provision that allows for adjunctive relief. Private acts by private actors. I believe so, but if I may, I'll follow up on that. But in all events, the right is exclusive with respect... No, but it could be de facto exclusive, i.e. you're the only person that at present the FCC has authorized to use the L-Ban. But that doesn't mean you actually have a right to exclude others because tomorrow the FCC could decide to extend a right to use the L-Ban to yet another private entity. Respectfully, Your Honor, I think it's de jure exclusive because as a legal matter, the license holder does have the exclusive right to use it unless and until the FCC makes such a change. Now, that kind of sharing can happen. There's a statutory provision for it. But that kind of sharing is quite rare. It requires all kinds of technical workouts to make sure there isn't interference. To some extent, this sometimes comes up in patent land as well. The word exclusive may not, in fact, is not equivalent to having a right to exclude. So if you're the only one who has a license to use something, that does not all by itself give you a right to exclude. And for takings purposes for this property, do you have a property right, the right to exclude feels like it's extremely important. Yes. I agree. But you don't get that out of 301 by itself. Well, I think you get that by the enforcement of 301. Only if you have a private right of action. And if the commission doesn't have discretion, even if you go to the commission and say there's an intruder, the commission may be intervening. I don't mean that as a legal matter. An intervening roadblock between you and getting that exclusion that you want. I suppose it's a theoretical possibility, although I'm not aware of it ever actually manifesting itself. This isn't a theoretical possibility. This is a legal construct we're concerned about. You're focusing on having a right to exclude, and as Toronto just laid out, a concern that you actually do not have the property rights that you have. And I'm trying to address that. I do think that there is a right to exclude in the sense that it would be unlawful for, say, the City of New York to use this spectrum. It's unlawful. So that would be an unlawful intrusion on the right that has been given to us or any other unlicensed entity. It's an unlawful intrusion on the right that has been given to us by the license. That could be enforced through SEC proceedings. What if the City of New York started using the L-Ban and they applied to the FCC for a license to do so and the FCC looked at it and said, Granted, the FCC has the authority to do that. That does not mean, and so a couple of things about that. If they haven't done it here, obviously, were they to do so, I still think that there is an exclusive right there. There's a shared exclusive right by the licensees as against the rest of the world. Well, but the FCC can't grant to DOJ. It's only the NTIA that can grant. Well, that's the other point just to sort of go back to Your Honor's question about the way this works. I think we tried to lay it out in paragraph 22 of the complaint, the very statutory sites that govern this. Basically, the way it works is that Congress authorizes NTIA to decide which spectrum is going to be used for commercial use, private use, the FCC licenses that. The NTIA separately can allocate certain spectrum to the government for governmental uses including military uses. The FCC does have some sort of residual marginal authority to authorize some public use of the spectrum, but in general, the way the system works is that the FCC allocate, is charged to allocate, charged by Congress to allocate the spectrum that NTIA has decided will be used for commercial purposes. The L band is in that spectrum. It's been designated to use for commercial purposes. The FCC license is used for commercial purposes and our point here as we've alleged in the complaint is that DOD is squatting on that spectrum for its own governmental purposes. Is it clear that the NTIA has not authorized DOD to use the, whatever it is that you're alleging they use it for using? We believe it is clear. We have alleged that in our complaint. We're not aware of any NTIA authorization. My friend on the other side hasn't identified any NTIA authorization to do this. I really think there's an allegation in the complaint. Of course, we're here on a motion to dismiss. It's an interlocutory review. They have to be accepted as true. They are true. Is it your view that the NTIA would not be able to assign any portion of the L band? Is there, Judge Toronto asked Mr. Hale a question that I was also curious about, which is are the different bands are obviously based on different Hertz levels, whatever. Is it the case that the NTIA can only authorize use between 500 and 1500 Hertz or something, or whatever it is? Do you understand what I'm saying? It could be NTIA authorized government use in the L band. I'm not sure about the answer to that. I think in theory they probably could. Of course, they haven't. But if they were to have done so, let's say hypothetically they were to do so tomorrow with respect to this spectrum, I think that would be quite a bit like, for example, the Congress enacting a statute shortening the term of a pre-existing patent. Congress could enact that statute, but the statute would effectuate a taking. It would be a material change to a pre-existing property right. So there's an MOU between the FCC and the NTIA. I don't know if you're familiar with it. I've read it. And they can collaborate and work together and decide how government uses can be utilized alongside private uses. So why? What basis do you have for saying that the NTIA could not allocate to the government the ability to use a portion of that L band without the FCC being complicit? Well, I think the answer to that is that the FCC has the statutory authority. to license the spectrum for commercial use. And the FCC has done that. And the NTIA has a statutory authority to license government use. But it hasn't done that. It hasn't done that. And I think the whole way the system works is that they separate out the spectrum that's going to be used for commercial use, the NTIA does, from the spectrum that's going to be used for government use precisely to avoid problems like the one that the DOD's actions are causing here. That's the problem. That this is spectrum that has been allocated for commercial use. The FCC has the statutory authority to license it for commercial use. The FCC has licensed it for commercial use. And that license, we respectfully submit, does create property interest. We've talked about exclusivity, but also transfer and revocability have come up. And perhaps I could spend a minute addressing those. With respect to transferability, it is true that the FCC has to approve any transfer of a spectrum license. But those, one looks at Section 310, which governs transfers. Section 310 says that basically that what the transferee has to do is license, the transferee has to meet the requirements of Section 308. Section 308 is the provision of the Communications Act that basically sets forth the necessary qualifications to be a licensee. So the way this works basically is that if the transferee meets the qualifications to hold the license, then very strong presumption that transfer can occur. And then I would say- Mr. Grimley, what do I do about the following? Mr. Yale stood up here and said a lot of things about what, for example, the NTIA could do or not do that are the opposite of some of the things you're saying. The funny thing is, you're saying that the government could authorize use in the LBAN, but they haven't. Mr. Yale stood up here and said, no, the government can't authorize use in the LBAN. So I guess what I'm wondering is, since so much in my mind hinges on the exclusivity question for property interests, maybe the answer, since I don't feel like I've gotten great clarity in this argument, I'm not saying you're not providing great clarity, but I'm saying a lot of the things you're saying are not consistent with what the government said, and I don't think some of this stuff is briefed. Maybe the answer is I send this back to the Court of Federal Claims, and I ask them to more thoughtfully and thoroughly consider this property interest question, because I don't know that I'm getting all the answers I need to be able to drive it. I understand your honest instinct, and there's a lot of sense to that. I would say, in addition, a lot of the argumentation that the government's making here is about the way in which this license works and about the conditions, et cetera, and there's a whole lot of factual context that surrounds all of that. If our allegations, for example, are correct, which they are, that the conditions that were imposed that required DOD cooperation are the kinds of conditions that government agencies, including DOD, routinely cooperate to solve, that they were at the margins. Maybe we could help you all by answering some of the easy questions, like jurisdiction and the Darby question, but send it back on this property interest thing. I don't know. It's a very hard question. I feel like this case is destined for the Supreme Court, and I'll be honest. I don't feel that I have all the information I need to feel confident that I'm deciding it as well as I'd like to. I appreciate that. Your Honor, I'm sure, certainly appreciates. We think that the trial court got it correct with respect to property interest and regulatory and physical takings. Of course, we thought the trial court got it incorrect with respect to its legislative ruling, and that was not made part of this interlocutory appeal. I mean, there's so much money at stake here, $50 billion, and that's just the legato scenario. I mean, obviously, there are a lot of other telecom giants that are going to be impacted by what gets decided here. And that does, not quibbling with Your Honor's procedural suggestion, as I said, I think there's a lot of sense in it, but it does bring up some substantive points that I think are worth getting out there and on the table. One is Your Honor asked whether these licenses were paid for at auction. The answer is no with respect to these licenses. But, of course, the FCC's theory would apply in exactly the same way to licenses that were purchased at auction, often for billions of dollars. And there is, in fact, a major spectrum auction coming up in July at which the government hopes to raise many billions of dollars. And I would think that a ruling from this court that there's no property interest in these licenses under any circumstances, which is what the United States is asking to rule, would have a serious depressive effect on those auctions. And I do think it's significant that U.S. Telecom is in here with its amicus brief telling this court that the major telecom carriers, the wireless carriers have operated under the assumption that, of course, the Constitution would protect them from the kind of behavior that DOD is alleged to have engaged in here. It's one thing, and I think it's really important, this goes to jurisdiction, goes to Mobile Relay and Sanders and Prometheus and all these cases, to distinguish between a situation in which the FCC is exercising statutory or regulatory authority it has to modify a license or cancel a license. In Your Honor's Alpine case, of course, that was a license cancellation. The FCC had the authority to cancel the license. The statute said license cancellations have to be appealed to the D.C. Circuit, and I think that disposes of jurisdiction. But with respect to the merits and the existence of a property interest, the property interest, of course, is limited by the conditions of the license. And the FCC has reserved authority under the license to take certain steps. In Prometheus, it took a step of refusing particular transfers, had the authority to do it. So from a takings perspective, I think the right way to think about that case, and I think Mobile Relay is the same thing. Mobile Relay was some reallocation spectrum that made the spectrum less valuable. The FCC had retained authority under statutory authority and retained authority under the license to make those kinds of changes. And so the right way to think about those cases is the FCC didn't do anything. The FCC didn't do anything that would take away a property interest that the license had conferred because the license was conditioned on the FCC's residual authority to take those steps. That's totally different from this case. In this case, the FCC has granted us this authority, and DOD has, in secret, usurped that authority. Why does the secrecy matter? I mean, I was, I guess, scratching my head maybe even a little bit with a negative scratching of my head about this story you tell about secretiveness of DOD. You can't mean that it was – they were doing something unauthorized because then you lose your takings case. So is this just power? I don't see what – tell me what's the relevance to an element of the takings clause. If they were doing it openly, we would certainly have a takings claim. I guess the reason it's relevant, Your Honor, is because we went through years of FCC proceedings. No, I know that you have all kinds of financial pain and you want to complain about it. No, I was going to say something different about the relevance. DOD participated in those proceedings. DOD raised all these interference concerns, as did NTIA. The FCC, the expert agency, worked through them, said there's this residual problem here which can be easily solved, and we're going to give you the authorization to use the spectrum and ask you to solve that residual problem in cooperation with DOD. What we have learned since is that while all that was going on, DOD was actually using the spectrum. I know, but I'm still trying to understand what we should make of that. I'm not even sure to make something nefarious out of it. Maybe DOD has super secret military programs. It was not willing to tell the FCC about it. It was going to try to get practical relief from the FCC on a GPS theory. It got some. It got a condition that your client could not meet on its own. It needed cooperation. Maybe it needed more, and then it talked to the Armed Services Committee, with whom it was willing to share more information, and got even more relief. Never mind whether all of that is nefarious. What does it have to do with the takings analysis? Well, I think you're honest right about that, but I guess with all of that goes to, then they may well have a need to keep it secret. But it seems to me this is a classic situation in which the property owner is being forced to bear a cost that the public should bear. If it is indeed true that they need that spectrum for a secret program, we don't contest that. If it's true, fine. They need it for a secret program. We're not trying to block their use of it. Can I ask this question? So suppose that the – I'd like to try to disaggregate the fact that here the non-cooperator intruder – those are the two basic theories, right? Non-cooperator intruder. Non-cooperation under a condition that the FCC wrote into the license that you, the licensee, have to secure a certain amount of cooperation, which you're not in control of, and then intruder. Assume for a minute that it was not DOD, but it was the city of New York. How, if at all, does the analysis change for takings purposes? The city of New York being a governmental entity, so it's presumably subject to the takings class. Yeah, I don't think it does change. It's a governmental entity that's using spectrum that has been the exclusive authority to use of which has been given to us. So I don't think it makes – I don't think it makes a significant difference. It's a governmental entity that is spotting unlicensed spectrum. If I'm not, you know – I'm sorry, please. No, no, you're going to stay on topic. I'm going to change topic, so you stay on topic. No, I was going to change topic. Go ahead. Physical taking. Yeah. As I read your – this is count one, I think, of your complaint, consistent with at least my understanding of whatever this category of physical taking is, it's sort of narrow, but it doesn't depend on any actual interference with the property owner's interest. It's just that the property owner has a property interest, including a right to exclude. Somebody else comes in – somebody else under state authority comes in and is intruding, and even if it's putting a cable box on the top of an apartment building, which doesn't in any way interfere, or sending union organizers onto a farm, no disturbance, that that is actually a physical taking. And the claim, the count, I think, does not in any way invoke interference with your own use, which you say because of the non-cooperation you weren't able to engage in anyway. What do I make of – is that, in fact, your claim, that you have a physical taking claim, even if your use was not affected because there was some other independent cause? I guess I would – not quite in the hypothetical, but reframe it a little bit. I think we would have a physical taking claim even if we weren't yet using the spectrum because it has been – the exclusive right to use it has been allocated to us. But I do think, as a practical matter – and this links up with the conditions point, which I would appreciate being able to spend a few minutes talking about. I'm going to ask an intervening question before you turn to that. But I do think – just take a step back. We're talking about spectrum. And as your Honor's questions and my friend on the other side indicated, the whole idea behind the system is that you've got to allocate exclusive use except under these rare sharing circumstances, which requires a lot of technical cooperation. The whole point is that you've got to allocate exclusive use because of the interference problem. And so the reason that the physical taking – Well, but that wouldn't – there's de minimis use all the time. There's individuals that – ham radio operators, whatever – that use portions without FCC licenses. You know what I mean? So it's not always – That's of course true, Your Honor. But that's very much at the margins. And this is very much at the core. Let me ask you a big-picture question, which is to what extent Mr. Yale was stressing the ability of the FCC to revoke or modify. You, throughout your brief, have stressed the sort of historical understanding of people in the industry that that did not happen based on serious investment-backed expectations. To what extent, when I'm trying to think about a property interest, do I consider it from the perspective of what the law would allow to happen, i.e., the FCC could take it away from you tomorrow, modify it tomorrow, give a co-license to somebody else tomorrow, versus the historical expectation that people in the industry have based on historical practice? Like, for example, that Huber Treatise, which talks about how these things are pretty much automatically renewed. And if they weren't, a company wouldn't invest billions of dollars in building out the infrastructure to be able to supply the 5G, for example. So I guess my question to you is from a legal standpoint. Which of those two perspectives, or must I consider both? What's your best idea on precedent to help me understand to what extent am I looking at the practical realities of how it seems to be working and how they affect people's expectations versus the statute, which might clearly say you could lose this tomorrow and we don't even have to tell you why. Do you understand the difference? I do. I think the answer is both. And I'd like to sort of address each side. No, I would like you to. Tell me the best cases that you think exist for helping me frame where I ought to come out on that. So first, with respect to statute and revocability, I do want to point out, because I think it's really important to the takings analysis, which is in turn important to the reasonable expectations part of it, that revocability is something that the FCC can only do as a matter of statute under very rare circumstances. Section 312 lays out the grounds for revocation as one type of serious misconduct act or another. Those are the only grounds for revocation. They can't revoke it at will. And in addition, in 312, there are significant... Can't they allow other people to coexist in the spectrum? I mean, is there a limitation on their ability to grant another license in the same band? That would be revoking the exclusivity, to use your word, which doesn't come with that. I guess I would push back a little bit. I don't think it's revoking the exclusivity. I think it's modifying the exclusivity to let one other person share any exclusivity. It's still exclusive. There's still anybody who doesn't have a license is going to be an unlawful user of it. And so, I mean, the fact that you have co-tenants in a lease department, they would both have a takings claim with the apartment taken, I think it's in that nature. And again, Your Honor, I would respectfully caution that the idea that the FCC has the authority to allow sharing the spectrum doesn't seem right to me that that should drive the analysis here because that is a rare thing that happens at the margins. How do we know that? How am I supposed to know that? It's not in the brief. It's not on the record. I understand. We have done our best to respond to the arguments that the government has made, to defend the trial court's ruling. Oh, no. Look, you're right. I mean, almost every other word in your brief was exclusivity, and the government gave it not a passing thought, but it's all I spent the last several days on. I appreciate that. So, as I said, we don't have any objection to further consideration in the trial court of this issue of exclusivity and any other issues the court thinks are important. Can I come back? Yes, I know you have a follow-up question, of course. So, physical takings. So, the entire source of the assertive property right here is the April 2020 order against the background of Title 47. One way to think about Title 47, expressed in Sanders and Turner and others, is that it is concerned about interfering uses. That's the point of the regulation, of the regulate. All the spectrum is ours, and we want to control who gets to use it. That's what I mean by regulation. That is a narrower notion than the notion that gives rise to physical takings when there is no actual interfering use at all. So, maybe that makes physical takings doctrine a bad fit for this particular kind of, for a right deriving, this right that you say derives from Title 47 as implemented in an order, so that, you know, leaving other kinds of takings claims, which are obviously harder to establish. So, first point. Government does not contest that if we have established a property interest, that we have a regulatory takings claim. They haven't challenged that. Right, right. And even an extreme locused claim, they haven't disputed that either. But I do think it is, physical takings is apt here, Your Honor, precisely because the electromagnetic spectrum is a physical thing in the world, and what the FCC allocates is exclusive use of a particular physical thing in the world, and the unlawful occupation of that licensed allocated spectrum creates the very interference problem that the regime is designed to protect against. So, I do think that the physical takings theory actually fits this quite well. Had there been physical takings claims within the Cosby-based overflight situation, where the plane isn't physically going through the landowner's airspace, but rather going nearby, and sound waves are coming across and, you know, disturbing the cattle? I should know the answer to that. I do not. You didn't entirely answer my question. Maybe my question was too long. But do you have any cases you'd like to direct me to that you think would help inform that question that I had in my brain, which was as between sort of a ability of the FCC to revoke change or whatever, you then clarified, oh, they can't just revoke for no reason, but they could add people for no reason, theoretically, I think. And so between that and then on the other hand, what I said is investment-backed expectations that parties have, like that Huber Treatise, for example. Do you have any cases that you think inform how I have to take all of that into account or how to think about it or which one gets more weight in a property bundle stick analysis or whatever? Is there anything you'd like to point me to that you think would help me? Yeah. I think the right way to think about it is that the point about investment-backed expectations, which I think the U.S. Telecom Brief amply demonstrates the existence of here, and which I also think is important to consider in thinking about the property right because while this preventing interference was the genesis of this whole regulatory regime, it is equally true, has been true for a very long time, and I believe this is part of the foundation for the point Huber Treatise is making, is that the point of granting this exclusivity and protecting against unauthorized use is to create a situation in which the licensee has the incentive to make the massive investments that are necessary to ensure that this spectrum serves the public interest. And that's the critical thing here. That is where the reasonable investment-backed expectations come from. That is a belief that the statutory exclusivity relative freedom of transferability, the strict limits on revocability, create something... But you can't be in any cases. And I'm coming to one. Oh, you're going to get to a case? Got it. Go ahead. So I think one case to look at for this, though it's not going to discuss the issue in exactly these terms, is the United Nuclear case in this court. That was a case in which an entity bid for and obtained mining rights. The mining rights were on tribal land. They obtained a lease from the tribe. They had to get a mining plan approved before they could actually go in and get the minerals that they were seeking to mine. Approval by the Secretary. By the Secretary of the Interior. The Secretary of the Interior arbitrarily withheld the grant of the approval of the mining plan. It wasn't arbitrary. He just wanted to defer to the Navajo Tribal Council. Yes, but I think that that was so far afield from the kinds of considerations that the Secretary had previously applied in deciding whether... Not just not arbitrary, just a big shift. Well, I think arguably an arbitrary one, but at a minimum an extremely unexpected shift. And the mining company had invested millions of dollars to prepare, to actually engage in the mining. And as I read this court's holding, it's essentially saying, look, in this situation, the mining company had an expectation. It had these rights. It invested in these rights. It had an expectation that it would get approval for its mining plan because its mining plan conformed in respects that had previously led to approval by the Bureau of Interior, by the Secretary of the Interior. That approval wasn't forthcoming. It made the mining rights worth nothing. That was it taking. Let me ask you a strategic question because you don't just want to win. You need a win that's going to hold up because this is not the end of the day for this case. So what if in my brain right now I was thinking of two possible options, and one option was resolve everything except for this property interest question, send it back to a very able judge at the Court of Federal Claims to further develop the arguments on this point in light of a lot of conflicting information that I've gotten at this argument, and leave to that judge to sort of do over on the property interest question? Or what if I just had all those other issues and I say, based on the arguments that were made today by the government, for example, about exclusivity and about you having a FAA enforcement action, what if even though I have serious doubts that that's all accurate, but the government did make those arguments, what if I say the government has not established that the Court of Federal Claims got the property interest wrong in light of all the statements in oral argument today? However, we have questions about whether that's accurate, and we encourage, since this is only at the 12B stage, the Court of Federal Claims to continue looking at this property interest case as the record develops. We'd certainly prefer the latter, Your Honor. But I understand the point about the need for a fuller elaboration. I think it's part of the reason we suggested to the Court that, like for a review, given all the fact specificity and context here, it wasn't the wisest course. But here we are. And so I think both of those would quite sensibly reflect the dilemma that Your Honor is identifying, but I think the latter would more fairly resolve the case, given where it is right now. We certainly don't have any concern about the Court of Federal Claims giving the property interest question an additional look based on new arguments, if the government is able to come up with them. I would hope, not technically before the Court, that the same thing would be true about our legislative takings claim, that if the Court's going to take a further look, it would take a further look at everything, but at least with respect to the claims that are before this Court now, that certainly would be a sensible resolution, I think. Any further questions? I know I've been up here forever, but there is one point I want to make about that. Is that the one? Is it preconditions? Yes. Okay, good. So I'm going to add to the confusion, and I apologize, Chief Judge Moore, for adding to the confusion, but I just want to make sure, and our briefs were not clear about this, and I apologize for that, too. But I think there's an important point here with respect to these conditions, and it's reflected in paragraph 138 of the FCC order. That's the paragraph that addresses commencement of operations, and this paragraph… Is this the immediate question? Are you going to be addressing the immediacy? Well, the key point I want to make, and I can go through the language, is that… Paragraph what? 138.  The conditions that cannot be fulfilled because of DOD non-cooperation apply only to a subset of the license spectrum. Right, certain bands. Yes. So what this provision provides is that there shall be a prohibition of at least 90 days from release of the order generally. That's to conform with 42 U.S.C. 343, 47 U.S.C. 343. How does what you're explaining now impact the arguments you've made? Well, because to the extent the court is inclined to agree with the government that there is no property interest here because all of the conditions haven't been fulfilled because DOD hasn't cooperated, I want to point out that the DOD cooperation limits use only of a subset of the license spectrum, only the operations in the 1526 to 1536 band, which is a subset of what we've been licensed to do. So you're saying that your license for other portions of the L band beyond just that particular range and DOD's use of those other portions has no string, or your use of those other portions has no strings attached? Well, a somewhat modification of that, I'm going to have to mix metaphors, I don't know how to do it. We've satisfied all those conditions. So if there were strings attached, they're no longer attached. The strings that still attach… Are you using them, then? Or why aren't you using it? Because we know we can't use it because if we did, we would run right into the DOD's use of the spectrum. What are you talking about? Well, because… That doesn't make technological sense to me. I'm afraid it does, Your Honor, because the DOD is using all of the spectrum, not just the portion that the FCC has identified as in need of further conditioning. It's using all of the spectrum. And if we were to use the spectrum, it wouldn't work because the DOD is using it and there would be so much interference that we wouldn't be able to provide service. And we're also trying to be good citizens based on our understanding of what's actually going on with respect to that spectrum. So I do think that is important to consider here in thinking about the conditions. Do you have any further information about when you satisfied the other conditions, the ones outside? I believe, Your Honor, that we submitted a letter to the FCC after 90 days saying we satisfied all the conditions. We can satisfy them even with respect to DOD. We have taken every step that the order requires us to take with respect to DOD. So you're saying for the spectrum not articulated in paragraph 138, you are fully prepared to be able to utilize that portion, which the FCC has authorized you to do, and the only reason you can't is because DOD is squatting on it. Correct. We've alleged that and we'll approve that at trial. And just to be clear, you think that if you told the FCC that the FCC doesn't have authority to tell DOD to stop? Correct. And I think that's clear from the government's brief because, and I apologize, it's a little disparaging, but the government said, well, we should go back to the FCC and have them ask DOD to play nice. I mean, that's essentially what they said. We shouldn't speak as a remedy. They obviously don't have the authority to order DOD to do it.  And why does the FCC not have authority to tell a squatter to stop? Well, I'm sorry. I mean, the government could be, for all kinds of reasons, trying to word what it's, you know, very carefully what it's wording. I guess I want your view about the actual, what you think the FCC has authority to do or not do, to do with respect to the DOD action, the squatting that you allege. I want to make a point about conditions. I don't want to answer about squatting. I think they can encourage DOD to cooperate to satisfy the conditions, but they can't order them to do so. That's why the government said what it said about asking to play nice, essentially. With respect to squatting, I don't see what authority, I can't think of what authority they would have. You know, as my friend on the other side said, well, you know, DOD is not a person within the meaning of statute, can't be sued. I just don't, I'm not able to conceive of any authority the FCC would be able to invoke to forbid the DOD from conducting this program, which, although it's, you know, a secret program, you know, presumably they're acting pursuant to some kind of statutory authorization. Well, your position is they are. Yes. Right.  Yes. Okay. Thank you. I very much appreciate all the court's attention to this case. Thank you. All right. I guess just a couple of points. I mean, if there are, it seems like there are additional questions on some of the statutory authority, one other option I guess I would just submit would be to submit a supplemental brief on those particular points. You know, I know there was a lot of various different issues. On sort of the preconditions, I mean, the trial court held, I mean, we made the argument that Legato has never submitted that it's met those, the commission, those conditions, this program. The commission's inherent in the license. That was never disputed. I mean, the trial court pointed out that Legato never said they actually met those conditions, so that was uncontested at the trial court. We think that that's a barrier to moving forward with the license because the FCC, who was looking into this interference issue, you know, said that, you know, that program had to be set up before operations commence, before there is actually use. And the property interest, if there is one, could only possibly be the use of the spectrum. Do you have any thoughts about Judge Toronto's final question to Mr. Relly about what the FCC could do if DOD was legitimately squatting? Like, if, you know, they had met the preconditions, they had notified the FCC we've met the preconditions, we want to get on the L-band, but we can't because DOD's on there. And they notify FCC. What, if anything, could the FCC do about that vis-a-vis DOD? Well, I think the FCC could work with NTIA and determine, well, does DOD actually need this? Do they need to get a license? Does the spectrum need to be reallocated? Well, if they work with NTIA, at least the allegations in the complaint are DOD does not have NTIA authorization to be using the spectrum. So why would the FCC need to work with NTIA if NTIA is not considered an afforded use? NTIA is essentially like the front agency for dealing with the FCC on these spectrum issues. They could also, if DOD has participated in this proceeding, they could talk to DOD directly as well. Sort of a couple of points on just the investment backed expectations. I mean, I think that's black letter law, that that comes in at sort of step two, regulatory taking. I mean, that's right from Penn Central, that particular concept. But how, if at all, does it influence whether somebody has a property interest? I mean, do you just, is the evaluation purely objective in terms of the license and the terms? Or do I factor in as well, for example, that Huber automatically renewed stuff, right? That's sort of like, if the whole industry has an expectation that they have this license for a long period of time, and that's why they're, does that matter in assessing whether there really is a property interest at heart? Sure, Your Honor. Our response would be it's a legal objective test. So, you know, in CONTI and all of these cases, the property interest has to come from, it doesn't come from the Fifth Amendment. It doesn't come from people's thoughts or expectations. It comes from an independent source of law. Here it would be from the Communications Act primarily, and looking through those specific provisions. So if there's not a provision that specifically- So if there isn't a provision that, for example, suggests renewal is automatic, then I should just disregard, even if the Huber Treaties had a survey that said every single one of these in history has been renewed, and that that's always renewed because people invest $5 billion in it. If it wasn't renewed, no one would do it. So if there were that kind of evidence, which I know that's not exactly the evidence in this case, that would be irrelevant to whether there's actually a property interest, as long as the statute said it didn't have to be necessarily renewed. That's what I need to go with. I'm just trying to understand. Right, because the source of the property interest is important, and it has to come from an independent source. So here it has to come from Congress. It has to come from the statute. It may be the case that- So even a reasonable expectation that you're being awarded a property interest based on past performance of agencies is irrelevant, you think, to whether a property interest was actually awarded. Correct, Your Honor, because you have to look specifically at the statutory text. And, again, if you demonstrate a property interest, investment-backed expectations comes in at step two. I mean, that's one of the three prongs, and so you can look at that. And that might go towards whether or not there's a regulatory taking, but it can't go towards whether or not there's a property interest. Okay, thank you. No, you don't get to talk anymore. I just want to- No, no. I want to correct an error that I made. Okay. I want to correct an error you made. I want to correct an error. And then he gets to talk after you. Okay. Thank you, Your Honor. I appreciate the appreciations of letting me say this. When I said the primary of action was 402B, it's 401B. So I misremembered the statutory site, but there is a primary of action. Anything you want to say in response to that, or are you good? I think at this point I'm good. Okay, thank you. Thanks, both counsel, for taking their submissions.